1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**EASTERN DISTRICT OF CALIFORNIA**

10

11    ANTHONY LOPEZ,                          )    Case No.: 1:10-cv-00390-AWI-JLT
                                              )
12                    Petitioner,             )    FINDINGS AND RECOMMENDATIONS TO
                                              )    DENY FIRST AMENDED PETITION FOR WRIT
13            v.                              )    OF HABEAS CORPUS (Doc. 37)
                                              )
14    MICHAEL MARTEL, Warden,                 )    ORDER DIRECTING THAT OBJECTIONS BE
                                              )    FILED WITHIN 21 DAYS
15                    Respondent.             )
                                              )
16    _____)

17            Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant

18    to 28 U.S.C. § 2254.

19                                    **PROCEDURAL HISTORY**

20            Petitioner is in custody of the California Department of Corrections and Rehabilitation serving a

21    determinate sentence of 12 years pursuant to a judgment of the Superior Court of California, County of

22    Tulare (the "Superior Court") for his 2007 conviction following a jury trial of four counts of forcible

23    oral copulation.

24            Petitioner filed a direct appeal in the California Court of Appeals, Fifth Appellate District (the

25    "5th DCA"), which affirmed Petitioner's conviction on November 26, 2008.  (Lodged Documents

26    ("LD") 4, Ex. A).   Petitioner filed a petition for review in the California Supreme Court that was

27    summarily denied it.  (LD 6).  After that Petitioner filed a state habeas petition in the California Supreme

28    Court, which was denied with a citation to In re Dixon, 41 Cal.2d 756, 759 (1953).  (LD 7).

On January 25, 2010, Petitioner filed the instant petition.  (Doc. 1).  Following a stay of proceedings, Petitioner filed a first amended petition on January 20, 2012 (Doc. 37), to which Respondent filed an answer (Doc. 44).  On June 6, 2012, Petitioner filed his Traverse.  (Doc. 48).

Respondent alleges Ground Two may be unexhausted, depending upon the Court's construction of the claim, and that Grounds Three and Four are procedurally defaulted.  (Doc. 44, p. 9).

## **FACTUAL BACKGROUND**

The Court adopts the Statement of Facts in the 5th DCA's unpublished decision[1]:

J.S.'s mother married Lopez when J.S. was approximately nine years old. Lopez began molesting J.S. when she was a sophomore in high school. J.S. was molested approximately 30 times between 2002 and 2004 at her house and while she and Lopez stayed in motels during softball tournaments.

At first, Lopez began entering the bathroom for no apparent reason while J.S. was showering. A few weeks later, Lopez was in J.S.'s bedroom when he called her into the bedroom. Lopez was lying on the bed and told J.S. to sit next to him. Lopez began rubbing J.S.'s arms and legs while talking to her. Lopez took off his pants and placed J.S.'s hand on his penis and forced her to masturbate him until he ejaculated. Lopez became more affectionate towards J.S. after these incidents.

J.S. did not know why she was being molested by Lopez. She did not tell anyone because she was scared and embarrassed. In the past, Lopez had hit her and grabbed her so hard on the arms that he left bruises. Whenever her mother asked about the bruises, J.S. told her they were from playing softball.

On one occasion Lopez took J.S. into his bedroom and made her remove her pants. Lopez put J.S. on the bed, held her legs, and orally copulated her. Lopez told her to keep her mouth shut, and J.S. complied. J.S. weighed about 110 pounds at the time and, although she was strong, Lopez could overpower her.

On another occasion J.S. followed Lopez into his bedroom to ask a question. Lopez threw her down on the bed, lay next to her and began rubbing her back. Lopez took off his pants and made J.S. remove her shirt. Lopez rubbed J.S.'s breasts and then he grabbed her hair and forced her to orally copulate him. J.S. vomited on the floor. J.S. slipped and fell on her vomit as she tried to leave after Lopez ejaculated. Lopez told J.S. to stop crying and to clean up the mess she had made on the floor. J.S. kept crying and did not know what to do. J.S. did not call anyone and report the molestation because she was afraid she would get into trouble.

J.S., who excelled at softball, played on a traveling softball team while in high school. Lopez always would accompany her on trips, while her mother and sister also came along occasionally. Lopez and J.S. often would not stay at the same motel as other members of the team to save money. On one occasion, after a softball game, Lopez again forced J.S. to orally copulate him. On another occasion, Lopez told J.S. to get his pills while they were staying in a motel room for a softball tournament. Lopez was referring to his Viagra pills. Lopez took a pill and later forced J .S. to orally copulate him again.

---

[1] The 5th DCA's summary of the facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1). Thus, the Court adopts the factual recitations set forth by the 5th DCA.

2

The molestations occurred more frequently while at home. The other incidents were the same type of conduct and occurred either in her bedroom or in her parents' bedroom. No one saw any of the molestations.

J.S. had to ask Lopez for permission to do everything, including taking a shower or eating. If she did not ask permission, Lopez would yell at her or ground her. J.S.'s mother was working most of the time. Lopez was "always at home." J.S. was required to be home shortly after school. If she was late, Lopez would yell at her. Lopez also retained the right to approve any clothes purchases J.S. wanted to make and occasionally would pick out clothes for her.

Lopez attended all of J.S.'s softball practices and all of her games. He would yell at her during practice. On some occasions the comments would be designed to improve her game, and on other occasions J.S. felt as if Lopez was just being mean.

Lopez would not allow J.S. to date while she was in high school. She had a boyfriend while in high school named J.J. She first met J .J. when she was in the seventh grade and he was a freshman or sophomore in high school. J.J. was approximately two and one-half years older than J.S. She met him through his sister, with whom she played softball. Lopez knew that J.S. hung out with J.J., but forbade her from kissing J.J. When Lopez found out she had kissed J.J., he forbade her from seeing J.J. anymore. J.J. wrote a letter to her parents insisting he be allowed to continue seeing her. After the letter, her mother also forbade her from seeing J.J.

When J.S. started high school, she started seeing J.J. again. Neither Lopez nor J.S.'s mother knew that she was seeing him. She asked her friends not to tell Lopez she was seeing J.J.

Various colleges recruited J.S. to play softball. One was Mount Marty College in South Dakota. J.S. met with the coach, Clint Frederiksen. She told Frederiksen that she had a boyfriend and asked him not to tell her parents because she was not supposed to have one. J.J. was planning to move to South Dakota to be with her. J.S. asked Frederiksen if there were any schools nearby that were affordable for J.J. Frederiksen provided her with some information on other nearby colleges.

Problems developed when Frederiksen told J.S. her social security number and other information was not correct on some of the admission forms she submitted to the university. Eventually, Frederiksen lost interest in recruiting her and stopped responding to her e-mails.

On May 27, 2004, J.S. was at school when she received a phone call from Lopez. Lopez was upset. He said he had received a letter from Frederiksen stating that she was dating J.J. Lopez told her she had to come home immediately because she was in trouble. Lopez called her a whore. She called her mother, L.L., and told her she had been dating J.J. and Lopez was angry at her because he had learned of her relationship with J.J. She said she did not want to go home because she was scared. L.L. told her to stay at school until she (L.L.) could get home.

When J.S. arrived at home, L.L. and Lopez were present. Lopez started yelling at her, calling her a whore and stating she broke his rule because she was not supposed to be dating. Lopez told her she was not going to be able to live in the house anymore. L.L. said she did not have to move out. In the midst of this argument, J .S. told L.L. that Lopez had been making her do things she did not want to do. She exposed Lopez because he kept yelling that what she was doing was wrong, and she knew that what Lopez had been doing to her was wrong.

L.L. started crying and told Lopez he would have to leave. Lopez packed his bags and, as he was leaving, asked that he not be arrested until after J.S. graduated. He also stated that it was not J.S.'s fault. Lopez called his father to pick him up.

L.L. took J.S.'s cell phone after Lopez left. J.S. did not use that cell phone again. After Lopez left, J.S. and her mother spoke. The two then went to the police station. Lopez and his father

were at the police station when J.S. and L.L. arrived.

L.L. testified that she met Lopez at the business at which they both worked. They married in 1996. Initially, they had a good relationship. After Lopez stopped working because of various illnesses and disabilities, however, L.L. became the sole source of income for the family and had to work a lot of hours. The relationship started to become more difficult. Occasionally they were intimate, and Lopez would sometimes take a Viagra pill before they had intercourse. Lopez was able to achieve an erection.

J.S. and Lopez initially had a good relationship. Lopez started treating her differently around her sophomore year in high school. It appeared that Lopez did not want her talking to anyone. J.S. denied anything was happening between Lopez and her when L.L. asked. L.L. inquired because it appeared to her from comments that were made and looks Lopez would direct at J.S. that there might be something happening between the two. It appeared to L.L. that Lopez was totally focused on J.S. L.L. was suspicious that something might be going on, but both Lopez and J.S. denied it.

One morning, L.L. observed Lopez lying next to J.S. in her bed. J.S. appeared to be asleep, and Lopez was rubbing her back. L.L. yelled at Lopez, who explained that was how he woke J.S. in the mornings. L.L. told Lopez to stop such behavior.

L.L. also found Lopez's Viagra medication in his traveling bag when he returned from one of J.S.'s softball tournaments. When J.S. or L.L. suggested that J.S. go to a tournament without Lopez, he responded that her softball was all he had left (referring to his various illnesses and disabilities).

J.S. was not prohibited from dating in high school, but L.L. preferred that she did not so that she could focus on her education. L.L. did not recall hearing Lopez tell J.S. she could not have a boyfriend. L.L. would not have been upset if J.S. had a boyfriend in high school. She did not know that J.S. was seeing J.J. while in high school.

On May 27, 2004, L.L. was at work when she received a phone call from J.S., who was very upset, almost hysterical. She stated that Lopez learned she was dating J.J., and she was afraid Lopez would hurt her. L.L. told J.S. not to worry about it, and they would discuss it when she got home. She told J.S. not to go home and that she would be home in a little while. A short while later L.L. received a phone call from Lopez. Lopez was "ranting and raving," calling J.J. a "fucker," "faggot," and "asshole," and calling J.S. a "whore." Lopez stated that J.S. would have to move out of the house. Lopez did not say anything about J.S.'s scholarship to Mount Marty.

The two phone calls caused L.L. to be alarmed. J.S. was not at home when L.L. arrived. Lopez was pacing and continued to rant and rave, calling J.S. and J.J. names. He was very angry because J.S. was dating J.J.

When J.S. arrived a short while later, Lopez began questioning her about J.J. and continued calling both of them names. Lopez ordered her out of the house. L.L. did not understand why Lopez was so angry and was trying to discover the cause of the anger.

L.L. did tell J.S. that if she was going to continue to lie, then it would be better if she moved out when she turned 18. L.L. did not say, however, that J.S. had to leave the house immediately.

At this time J.S. stood up and said that Lopez should tell L.L. what he had been doing. L.L. did not know to what J.S. was referring, so she told her to just say it. J.S. stated that Lopez had been forcing her to do sexual things. Lopez sort of laughed. L .L. told him to leave, and Lopez got up and walked to the back of the house.

4

L.L. was in shock. J.S. was sitting on the couch crying. Lopez packed his clothes. Before he left, Lopez came into the living room and told L.L., "Don't blame [J.S.], it's not her fault." L.L. told Lopez she was going to have him arrested. Lopez asked her to wait until after J.S. graduated from high school. L.L. refused the request. Lopez never denied the allegation made by J.S.

Lopez gave L.L. his cell phone before he left. Lopez's father and J.S. also had cell phones. L.L. asked J.S. for her cell phone after Lopez left because she did not want Lopez calling her. L.L. put the cell phone in her purse and then took J.S. to the police station, along with her youngest daughter. L.L. did not return the cell phone to J.S., nor did she allow J.S. to take a cell phone out of her purse.

Lopez was already at the police station when L.L. and J.S. arrived. L.L. was uncomfortable sitting in the same area as Lopez, so she asked if she could sit somewhere else. While they were waiting, the only time L.L. left J.S. was when the interviewing officer asked her to leave for a short while.

L.L. received a letter from J.J. when he and J.S. first started seeing each other. The letter was very nasty and asserted that he and J.S. could do whatever they chose. The letter also called L.L. names. As a result, L.L. did not care for J.J.

J.S.'s high school softball coach for her sophomore, junior and senior seasons, Lance Wallace, confirmed that Lopez was "pretty tough" on her, and that he was the only parent who attended almost every practice and game. Her high school softball coach during her freshman year, Stacy Hanson, confirmed that Lopez was at every practice and would interfere with the team. She eventually closed the practices to parents because of Lopez. Lopez would still attend practices, but observed from a distance.

J.J. confirmed that he and J.S. had a boyfriend/girlfriend relationship before she entered high school, which resumed when she was approximately a junior in high school. The two kept their relationship secret from J.S.'s parents when she was in high school because they would not approve of the relationship. He described Lopez as very hard on J.S. during softball games and practices. J.S. stated she was afraid of Lopez.

J.S. did not tell J.J. that Lopez was molesting her until after she graduated from high school. She was crying hysterically when she disclosed the molestations. J.J. also thought that J.S. was an accomplished liar because of the need to keep her relationship with him secret.

Anthony Urquiza, Ph.D., is a psychologist and professor at the UC Davis Medical Center in Sacramento. His testimony was limited to explaining the Child Sexual Abuse Accommodation Syndrome which describes characteristics common to children who have been abused sexually. The syndrome consists of five parts: (1) secrecy, (2) helplessness, (3) entrapment and accommodation, (4) delayed and unconvincing disclosure, and (5) retraction.

Lopez presented numerous witnesses in his defense. Luis Velosa, M.D., is a psychiatrist who treats patients and testifies as an expert witness. Lopez has been his patient since 2001. Lopez initially was suffering from severe depression and had a medical diagnosis that included fibromyalgia and diabetes. After about a year of treatment, Velosa concluded that Lopez was bipolar and adjusted his medications. Lopez began improving slowly. Lopez reported having problems with his sexual drive. Some of the medications Lopez was taking could cause impairment of his sexual needs.

Andrea Espinosa, M.D., began treating Lopez at the end of December 2003. His diagnosis included diabetes, peripheral neuropathy, hypertension, and fibromyalgia. He was taking medication for each of these conditions. Each of his conditions, as well as the medications, might cause sexual dysfunction.

5

Lee Coleman is a medical doctor specializing in adult and child psychiatry. Coleman testified that the Child Sexual Abuse Accommodation Syndrome is useless in attempting to determine whether or not someone has been abused sexually. He admitted that the various factors suggested by the theory could exist in a child that had been abused, but they could also exist if a child had not been abused. Coleman also criticized the interviewing techniques of the investigating officers, essentially opining that the officers were incompetent.

Frederiksen, who in 2004 was the softball coach at Mount Marty College in South Dakota, testified that he offered J.S. a softball scholarship to Mount Marty, but eventually rescinded the offer. He did this because J.S. told him she had a boyfriend and asked him not to tell her parents of this fact, and because she had provided him with an incorrect social security number. This was the only time Frederiksen ever withdrew a scholarship offer.

Lopez testified in his own defense. He described the diseases with which he had been diagnosed. He stated that in 2002 he developed a condition that ultimately required a circumcision. In the year prior to the operation, there were times he was not able to obtain an erection because of the pain. The operation was performed on August 16, 2002. Lopez was instructed to refrain from any sexual activities for two months after the operation.

Lopez stated his relationship with L.L. was not very good in the time period from 2001-2003 because he could not achieve an erection on a regular basis. It got to the point that Lopez was not able to achieve an erection without using Viagra. Lopez claimed that even with Viagra, he was able to achieve an erection only one out of every five attempts.

He described himself as a loving and caring father and husband, considering his physical disabilities. He denied that J.S. was afraid of him. He claimed the incident when L.L. saw him waking J.S. in the morning occurred when J.S. grabbed him around the neck after he woke her and he fell onto the bed. He denied that L.L. ever spoke to him about the way he looked at J.S. He also denied telling J.S. that she could not date in high school. According to Lopez, J.S. had a lot of freedom, as long as her homework was done.

He admitted that when he learned that J.S. was not going to Mount Marty College, he became upset, but he denied that he screamed, ranted, raved, or swore. He claimed he told J.S. to come home because he had found out she had rejected her last scholarship offer, and he had learned she had been dating J.J. He also admitted calling L.L. and asking her to come home right after work to resolve this matter. When both parties arrived, Lopez testified they calmly discussed the situation. He also claimed that he told J.S. that if she was going to continue to lie, she should move out when she turned 18.

J.S. was the one who was being emotional and confrontational during this discussion. After both Lopez and L.L. told her she could move out when she turned 18, J.S. got up and said she was going to tell L.L. what she and Lopez had been doing together. Lopez was shocked and told J.S. to say whatever she had to say because he had no idea to what she was referring. J.S. said something to the effect that Lopez had been making her lick him. L.L.'s only comment was "Bye." He stated it was not a good time for him to try and speak with L.L. because she appeared to be very angry.

Lopez did not say anything to J.S. because he was trying to understand why she would lie about him like that. J.S. began crying and then made a comment about it being her fault. L.L. began yelling at her, so J.S. just got quiet. L.L. told J.S. that it was not her fault. Lopez told L.L. to leave J.S. alone.

Lopez was very sad because he could not understand why J.S. would make up lies about him. He denied ever touching J.S. in a sexual way. Lopez concluded that J.S. made the accusation

6

because she was backed into a corner and accusing Lopez of sexually molesting her was the only way to avoid getting into trouble.

Lopez packed his clothes and called his father with the intention of coming back after a few days. He used the house phone to call his father. When his father arrived, Lopez began moving his things to his father's vehicle. At that time he asked L.L. if she was going to report J.S.'s accusations to the police. Lopez decided that he would wait for L.L. to calm down before trying to talk to her.

Lopez admitted that he told L.L. not to blame J.S. because it was not her fault. He claimed the statement was made when L.L. was yelling at J.S., and he was referring to his possibly having put too much pressure on J.S.

Lopez and his father traveled directly to the police station and waited for L.L. and J.S. While they waited at the police station, Lopez's father received a phone call from J.S. When Lopez was given the phone, J.S. told him he was now out of her life and she could do whatever she wanted.

Regarding L.L.'s claim that Lopez took a bottle of Viagra to a softball tournament, Lopez claimed it was a bottle of L-Arginine that he used to try to lose weight. He denied ever hitting J.S. after she started high school and denied ever threatening her.

The information, as amended, charged Lopez with four counts of oral copulation by force with a person under the age of 18, in violation of section 288a, subdivision (c). The jury found Lopez guilty as charged. Lopez moved for a new trial, alleging juror misconduct and challenging the sufficiency of the evidence. The trial court denied the motion and sentenced Lopez to the midterm of six years on count 1, plus two consecutive years for each additional count, for a total term of 12 years in state prison.

(LD 4, Exhibit A ("Ex. A"), pp. 2-11).

## DISCUSSION

I.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Tulare County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320 (1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997), cert. denied, 520 U.S. 1107 (1997), overruled on other grounds by

7

1    Lindh v. Murphy, 521 U.S. 320 (holding the AEDPA only applicable to cases filed after statute's

2    enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed

3    by its provisions.

4         II.    Legal Standard of Review

5         A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless he can

6    show that the state court's adjudication of his claim:

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of,
>      clearly established Federal law, as determined by the Supreme Court of the United States;
>      or
> (2)  resulted in a decision that "was based on an unreasonable determination of the facts in light
>      of the evidence presented in the State court proceeding.

10   28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

11        A state court decision is "contrary to" clearly established federal law "if it applies a rule that

12   contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts

13   that is materially indistinguishable from a [Supreme Court] decision but reaches a different result."

14   Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams, 529 U.S. at 405-406 (2000).

15   Consequently, a federal court may not grant habeas relief simply because the state court's decision is

16   incorrect or erroneous; the state court's decision must also be objectively unreasonable.  Wiggins v.

17   Smith, 539 U.S. 510, 511 (2003) (citing Williams v. Taylor, 529 U.S. at 409).

18        In Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court

19   explained that an "unreasonable application" of federal law is an objective test that turns on "whether it

20   is possible that fairminded jurists could disagree" that the state court decision meets the standards set

21   forth in the AEDPA.  If fairminded jurists could so disagree, habeas relief is precluded.  Harrington,

22   131 S.Ct. at 786.   The Supreme Court has "said time and again that 'an *unreasonable* application of

23   federal law is different from an *incorrect* application of federal law.'" Cullen v. Pinholster, 131 S.Ct.

24   1388, 1410-1411 (2011).  Thus, a state prisoner seeking a writ of habeas corpus from a federal court

25   "must show that the state court's ruling on the claim being presented in federal court was so lacking in

26   justification that there was an error well understood and comprehended in existing law beyond any

27   possibility of fairminded disagreement."  Harrington, 131 S.Ct. at 787-788.

28

The second prong of federal habeas review involves the "unreasonable determination" clause of 28 U.S.C. § 2254(d)(2).  This prong pertains to state court decisions based on factual findings.  Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003).  Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Wiggins v. Smith, 539 U.S. at 520; Jeffries v. Wood, 114 F.3d at 1500.  A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists."  Id.; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision.  See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state court decided the petitioner's claims on the merits but provided no reasoning for its decision, the federal habeas court conducts "an independent review of the record...to determine whether the state court [was objectively unreasonable] in its application of controlling federal law."  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2002); see Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions."  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

**III.  Review of Petitioner's Claims.**

The instant petition itself alleges the following as grounds for relief: (1) juror misconduct; (2) insufficient evidence to convict of forcible oral copulation; (3) improper introduction of propensity evidence; and (4) prosecutorial misconduct.

A.  Juror Misconduct.

Petitioner first contends that the trial court violated Petitioner's constitutional right to a fair trial

by denying his motion for a new trial based upon juror misconduct.  This contention is without merit.

           1.  The 5th DCA's Opinion.

The 5th DCA rejected Petitioner's claim as follows:

The parties agree with the process we must undertake to evaluate Lopez's claims of misconduct. The required three-step process was described by this court some 12 years ago.

> "Where a party seeks a new trial based upon jury misconduct, the court must undertake a three-step inquiry. First, the court must determine whether the evidence presented for its consideration is admissible. [Citations.] Declarations of jurors may be used to show that a juror concealed bias or other reason for disqualification by providing false answers during voir dire. [Citations.] When considering these declarations, the trial court must take great care not to overstep the boundaries established by Evidence Code section 1150.... This statute has thus been held to allow consideration of evidence of ' "overt acts"-that is, such statements, conduct, conditions, or events as are "open to sight, hearing, and the other senses and thus subject to corroboration"....' [Citations.] As a result, Evidence Code section 1150 may be violated 'not only by the admission of jurors' testimony describing their own mental processes, but also by permitting testimony concerning statements made by jurors in the course of their deliberations. In rare circumstances a statement by a juror during deliberations may itself be an act of misconduct, in which case evidence of that statement is admissible. [Citation.] But when a juror in the course of deliberations gives the reasons for his or her vote, the words are simply a verbal reflection of the juror's mental processes. Consideration of such a statement as evidence of those processes is barred by Evidence Code section 1150.' [Citation.]

> "Once the court finds the evidence is admissible, it must then consider whether the facts establish misconduct. [Citations.] The trial court may conduct an evidentiary hearing to determine the truth of the allegations set out in the declarations. [Citations.] 'The defendant is not entitled to such a hearing as a matter of right; the trial court has discretion to hold such a hearing.' [Citation.] 'The hearing should not be used as a "fishing expedition" to search for possible misconduct, but should be held only when the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred. Even [then], an evidentiary hearing will generally be unnecessary unless the parties' evidence presents a material conflict that can only be resolved at such a hearing.' [Citations.]

> "Finally, if misconduct is found to have occurred, the court must determine whether the misconduct was prejudicial. [Citations.] Once misconduct has been established, prejudice is presumed; reversal is required unless the reviewing court finds, upon examination of the entire record, there is no substantial likelihood that any juror was improperly influenced to the defendant's detriment. [Citations.]

> "The trial court's determination on a motion for new trial ""rests so completely within [its] discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears."" [Citation.]" (People v. Duran (1996) 50 Cal.App.4th 103, 112-113.)

The only evidence submitted by Lopez to support his motion was a declaration signed by one of the jurors (hereafter the declaration). The first step in our analysis, therefore, is to determine what part of the declaration, if any, is admissible. After discussing the admissibility of the various portions of the declaration, we will discuss whether the allegation demonstrates misconduct.

The first paragraph of the declaration merely identifies the declarant as one of the jurors in Lopez's trial. There does not appear to be any dispute that the declarant served as a juror at the trial, and this paragraph appears to be admissible.

The second paragraph describes a vote on guilt that was taken approximately 10 minutes after the jury began deliberations. While the paragraph appears merely to describe the process that occurred, it is not relevant to any issue on appeal, nor could it support a claim of jury misconduct.

The third paragraph accuses "several" jurors of discussing information outside the record during deliberations. The declarant does not identify any specific information that allegedly was discussed in this paragraph. Accordingly, this vague reference does not support an assertion of misconduct.

The fifth paragraph accuses Juror No. 6 of discussing during deliberations an incident where a relative was either a victim of molestation or was accused of molesting someone. While the allegation is admissible, it is so vague and remote that it does not provide any grounds for juror misconduct. We cannot tell from the declaration (1) whether the relative is closely related or a fourth cousin the juror met only one time, (2) when this alleged incident occurred, (3) what happened, or (4) the context of the discussion. This statement cannot support a claim of juror misconduct.

The declarant next accuses one or more of the jurors of stating that a specific defense expert "looked like he smoked pot." While the statement may be admissible, it is not evidence that any juror considered information not contained in the record. According to the declaration, the jurors did not say they had knowledge that the expert smoked marijuana. Instead, the jurors were, at most, making a colorful comment on their perception of the expert's credibility. It is the duty of jurors to assess the credibility of the witnesses who are testifying before them. This statement will not support a claim of misconduct.

In paragraph six, the declarant claims he or she was shocked by these disclosures and comments. Obviously, the declarant's personal view of the alleged comments will not support a claim of misconduct.

In paragraph seven the declarant states that Juror No. 4 explained some personal experiences regarding his work with Lopez's father. The declarant claims to be unable to recall the specific statements. Both parties agree that one juror, presumably Juror No. 4, disclosed during voir dire that he or she had worked with Lopez's father in the past. Accordingly, this is not a case where a juror failed to disclose a potential basis for bias. Instead, we have a vague recollection about what could be a completely innocuous remark. No grounds for misconduct appear.

Next are various comments made about the witnesses. One juror allegedly described L.L. as "dysfunctional," and described J.S. as being "young and smart." A comment also was made by a juror that "anyone can go out and get credentials to be a psychologist." Again, while admissible, these comments demonstrate nothing more than observations made by jurors during trial that may be considered when judging a witness's credibility. They certainly do not constitute misconduct. Moreover, the declarant's belief that "these comments were based on [the jurors'] personal experiences" is devoid of any evidentiary value. A witness may testify only to matters about which he or she has personal knowledge. (Evid.Code, § 702.) The declarant, by stating that he or she believed the comments were based on personal experience, affirmatively demonstrated a lack of personal knowledge. It is much more likely that the comments were the result of having observed the various witnesses testifying.

In paragraphs eight and nine of the declaration, the declarant describes the votes for guilt, a tense atmosphere in the jury room, some jurors exhibiting impatience with the process, and two jurors threatening to resolve their differences with fisticuffs outside the jury deliberation room.

These paragraphs simply describe the deliberation process and are inadmissible pursuant to the provisions of Evidence Code section 1150.

Next, in paragraph 10, the declarant accuses some of the jurors of disregarding the "legal definition" of "reasonable doubt" provided by the trial court, instead using "their own interpretation as to what they thought it meant." While the declarant couches his statement in terms of some jurors disregarding jury instructions, a close reading of the statement reveals much less. The facts provided by the declarant are (1) the trial court defined the term "beyond a reasonable doubt," (2) the jurors discussed the concept, and (3) "several jurors" interpreted the instruction using their own words in the course of deliberations. The third fact does not demonstrate misconduct, but instead is an attempt by the declarant to describe the jurors' mental processes. This statement is not admissible. (Evid.Code, § 1150.)

Paragraph 11 once again does nothing more than describe the deliberation process and suggests that the declarant felt pressured to change his or her vote to guilty. This paragraph is inadmissible. (Evid.Code, § 1150.)

In paragraphs 12, 13, and 14, the declarant states that he or she (1) now believes the prosecution did not prove Lopez was guilty beyond a reasonable doubt, (2) feels both J.S. and L.L. were not believable, (3) finds Lopez's testimony was credible, and (4) felt pressured to vote guilty and did so to avoid feeling alienated. These comments are not relevant to the issue of whether any juror committed misconduct, nor are they admissible. (Evid.Code, § 1150.)

The above discussion omitted a single allegation that is contained in paragraph four of the declaration because it is the only allegation that may have merit. In this paragraph the declarant accuses Juror No. 7 of admitting during deliberations that he had been accused of sexually molesting his own daughter, resulting in a police report and temporary removal of his child from his custody. Apparently, Juror No. 7 explained that no charges were filed, obviously making a conviction impossible.

Lopez contends that Juror No. 7 failed to disclose these allegations in voir dire, thus constituting misconduct. From our review of the record, we are unable to determine whether the juror who allegedly made this statement was asked on voir dire whether he had any personal involvement with a molestation case. While it is true that the trial court inquired with most potential jurors into this topic, it did not do so with every potential juror. Since the record does not identify the juror by number, Lopez has failed in his initial obligation to establish that the juror failed to disclose the charges after an appropriate inquiry.

Even if we were to assume the trial court or counsel inquired into the topic with the juror in question, reversal is not required. "Misconduct by a juror, ... usually raises a rebuttable 'presumption' of prejudice. [Citations.] This presumption aids parties who are barred by statute from establishing the actual prejudicial effect of the incident under scrutiny [citations] and accommodates the fact that the external circumstances of the incident are often themselves reliable indicators of underlying bias [citation]. [¶] Still, whether an individual verdict must be overturned for jury misconduct or irregularity ""'is resolved by reference to the substantial likelihood test, an objective standard.'"" [Citations.] Any presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no substantial likelihood that one or more jurors were actually biased against the defendant. [Citations.] [¶] The standard is a pragmatic one, mindful of the 'day-to-day realities of courtroom life' [citation] and of society's strong competing interest in the stability of criminal verdicts [citations]. It is 'virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.' [Citation.] Moreover, the jury is a 'fundamentally human' institution; the unavoidable fact that jurors bring diverse backgrounds, philosophies, and personalities into the jury room is both the strength and the weakness of the institution. [Citation.] '[T]he criminal justice system must not be rendered

12

impotent in quest of an ever-elusive perfection.... [Jurors] are imbued with human frailties as well as virtues. If the system is to function at all, we must tolerate a certain amount of imperfection short of actual bias.' [Citation.]" (In re Hamilton (1999) 20 Cal.4th 273, 295-296.)

The entire record in this case, specifically the nature of the misconduct, establishes that there is not a substantial likelihood that the juror who allegedly failed to disclose a prior accusation that he molested his daughter was biased against Lopez. Lopez's defense at trial is that J.S. fabricated her testimony in an attempt to end Lopez's control of her life. In other words, Lopez argued he falsely was accused of molesting J.S. Since the juror to whom Lopez is objecting also allegedly falsely was accused of molesting his daughter, we are certain that if he or she had any bias, it was in favor of the defense asserted by Lopez. Accordingly, the trial court properly denied the motion for new trial on the basis of juror misconduct.

(Ex. A, pp. 11-18).

2. Failure To State A Federal Habeas Claim.

At the outset, Petitioner's claim, as expressed in the first amended petition, is that the trial court erred in denying his motion for a new trial, specifically the claim based on juror misconduct.  (Doc. 37, p. 4).  This was the same allegation Petitioner raised in his direct appeal before the 5th DCA.  (Ex. A). Thus, Petitioner did not, and does not frame his claim directly as one of jury misconduct.  Hence, the gravamen of Petitioner's claim is the trial court's purportedly wrongful denial of a motion brought pursuant to California law and under California procedural rules.  In short, the issue, as presented, is one solely of state law.

As Respondent correctly argues, however, a federal habeas court cannot consider claims limited solely to violations of state law.  The basic scope of habeas corpus is prescribed by statute. Subsection (c) of Section 2241 of Title 28 of the United States Code provides that habeas corpus shall not extend to a prisoner unless he is "in custody in violation of the Constitution." 28 U.S.C. § 2254(a) states that the federal courts shall entertain a petition for writ of habeas corpus only on the ground that the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States. See also, Rule 1 to the Rules Governing Section 2254 Cases in the United States District Court. The Supreme Court has held that "the essence of habeas corpus is an attack by a person in custody upon the legality of that custody . . ." Preiser v. Rodriguez, 411 U.S. 475, 484 (1973).

Furthermore, in order to succeed in a petition pursuant to 28 U.S.C. § 2254, Petitioner must demonstrate that the adjudication of his claim in state court resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the

13

1    Supreme Court of the United States; or resulted in a decision that was based on an unreasonable

2    determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. §

3    2254(d)(1), (2).

4        "The criteria for a trial court in granting or denying a new trial are matters of state law.  As

5    such, an incorrect application would not be grounds for federal habeas relief, unless the alleged error

6    constituted 'a fundamental defect which inherently results in a complete miscarriage of justice.'"  Ward

7    v. Wolff, 499 F.Supp. 1129, 1131 (D.Nev. 1980) (quoting Hill v. United States, 368 U.S. 424, 428, 82

8    S.Ct. 468 (1982).

9        Petitioner does not allege a violation of the Constitution or federal law, nor does he argue that

10   he is in custody in violation of the Constitution or federal law. Petitioner does not allege that the

11   adjudication of his claims in state court "resulted in a decision that was contrary to, or involved an

12   unreasonable application of, clearly established Federal law, . . . or resulted in a decision that was based

13   on an unreasonable determination of the facts . . . ." 28 U.S.C. § 2254.  Petitioner argues instead that

14   the state court erroneously denied a motion that is authorized under, and governed solely by, state law.

15   As such, Petitioner raises only state a law claim, and, generally, issues of state law are not cognizable

16   on federal habeas review.  Estelle v. McGuire, 502 U.S. 62, 67 (1991)("We have stated many times that

17   'federal habeas corpus relief does not lie for errors of state law.'"), quoting Lewis v. Jeffers, 497 U.S.

18   764, 780 (1990); Gilmore v. Taylor, 508 U.S. 333, 348-349 (1993)(O'Connor, J., concurring)("mere

19   error of state law, one that does not rise to the level of a constitutional violation, may not be corrected

20   on federal habeas").   Indeed, federal courts are bound by state court rulings on questions of state law.

21   Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir.), cert. denied, 493 U.S. 942 (1989).

22       If Petitioner was to claim that the federal constitutional violation for juror misconduct is

23   inherent in his claim that the state court wrongfully denied his motion for new trial, Petitioner would

24   run afoul of the rule requiring exhaustion of the claim in state court.  A petitioner who is in state

25   custody and wishes to collaterally challenge his conviction by a petition for writ of habeas corpus must

26   exhaust state judicial remedies.  28 U.S.C. § 2254(b)(1).  The exhaustion doctrine is based on comity to

27   the state court and gives the state court the initial opportunity to correct the state's alleged constitutional

28   deprivations.  Coleman v. Thompson, 501 U.S. 722, 731 (1991); Rose v. Lundy, 455 U.S. 509, 518

(1982); <u>Buffalo v. Sunn</u>, 854 F.2d 1158, 1163 (9th Cir. 1988).

A petitioner can satisfy the exhaustion requirement by providing the highest state court with a full and fair opportunity to consider each claim before presenting it to the federal court.  <u>Duncan v. Henry</u>, 513 U.S. 364, 365 (1995); <u>Picard v. Connor</u>, 404 U.S. 270, 276 (1971); <u>Johnson v. Zenon</u>, 88 F.3d 828, 829 (9th Cir. 1996).  A federal court will find that the highest state court was given a full and fair opportunity to hear a claim if the petitioner has presented the highest state court with the claim's factual and legal basis.  <u>Duncan</u>, 513 U.S. at 365 (legal basis); <u>Kenney v. Tamayo-Reyes</u>, 504 U.S. 1, 112 S.Ct. 1715, 1719 (1992) (factual basis).  Also, the petitioner must have specifically told the state court that he was raising a federal constitutional claim.  Duncan, 513 U.S. at 365-66; <u>Lyons v. Crawford</u>, 232 F.3d 666, 669 (9th Cir. 2000), *amended*, 247 F.3d 904 (2001); <u>Hiivala v. Wood</u>, 195 F.3d 1098, 1106 (9th Cir. 1999); <u>Keating v. Hood</u>, 133 F.3d 1240, 1241 (9th Cir. 1998).

Here, there is no indication in the record that, in state court, Petitioner couched this claim as a federal constitutional violation or that it was ever presented to the California Supreme Court as such.  To the contrary, it appears the claim was always presented in state court, as here, solely as a violation of California law, and the 5th DCA's opinion refers only to state legal standards for ruling on a motion for new trial in assessing whether the trial court erred.  Nowhere does that opinion discuss the claim as a federal constitutional claim and, understandably, no federal cases are cited by the appellate court.  Accordingly, to the extent that the claim was exhausted in state court exclusively as a question of state law, it is not cognizable here as a question of federal law.  To the extent that Petitioner contends it was intended to be an implicit federal constitutional claim in state court, it was not, in the Court's view, fairly presented as such, as required by the exhaustion doctrine.  Therefore, the claim is either non-cognizable or unexhausted.  In either event, it should be dismissed without a consideration of the claim on its merits.  However, the Court will also reject the claim on its merits.

### 3.  Federal Standard.

The Sixth Amendment right to trial by jury "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." <u>Irvin v. Dowd</u>, 366 U.S. 717, 722 (1961).  If the jury is exposed to extrinsic facts not introduced as evidence, a defendant is deprived of his right to confrontation, cross-examination, and assistance of counsel under the Sixth Amendment. <u>Dickson v. Sullivan</u>, 849 F.2d 403,

406 (9th Cir.1988).   While the Supreme Court has never rejected the idea of implied juror bias, implied bias by a juror has rarely been applied.  See United States v. Plache; 913 F.2d 1375, 1377 (9th Cir. 1990); Tinsley v. Borg, 895 F.2d 520, 527 (9th Cir. 1990).  "Only in extreme or extraordinary cases should bias be presumed."  Plache; 913 F.2d at 1377, *quoting*, Tinsley, 895 F.2d at 527.

"[A] petitioner is entitled to habeas relief only if it can be established that the constitutional error had 'substantial and injurious effect or influence in determining the jury's verdict.'"  Lawson v. Borg, 60 F.3d 608, 612 (9th Cir.1995), *quoting*, Brecht v. Abrahamson, 507 U.S. at 637 & n. 9.   The Ninth Circuit has found that whether a constitutional error is harmless is not a factual determination entitled to the presumption of correctness under 28 U.S.C. § 2254(d).   Lawson, 60 F.3d at 612; Dickson, 849 F.2d at 405; Marino v. Vasquez, 812 F.2d 499, 504 (9th Cir.1987).   Thus, this Court does not simply defer to the California court's finding that there was no prejudice.

However, there is no requirement that a defendant be given a new trial each time a juror has been placed in a situation that could potentially be compromising.  Smith v. Phillips, 455 U.S. 209, 217, 102 S.Ct. 940, 946 (1982).  "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."  Id.

In determining whether the jury's consideration of extrinsic evidence was so substantial and injurious as to violate the Constitution, the Court must consider:  "(1) whether the extrinsic material was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the jury discussed and considered it; (4) whether the material was introduced before a verdict was reached, and if so, at what point in the deliberations it was introduced; and (5) any other matters which may bear on the issue of ... whether the introduction of extrinsic material [substantially and injuriously] affected the verdict."  Lawson, 60 F.3d at 612; see also Jeffries v. Blodgett, 5 F.3d 1180, 1190 (9th Cir.1993); Bayramoglu v. Estelle, 806 F.2d 880, 887 (9th Cir.1986).  "None of these factors should be considered dispositive."  Jeffries, 5 F.3d at 1190.  The Court is also to place great weight on the nature of the extrinsic evidence introduced.  See Jeffries, 5 F.3d at 1190-91; Dickson, 849 F.2d at 406-07; Marino, 812 F.2d at 506.

As well, the Court looks to whether the extrinsic evidence was "rendered insignificant by

16

overwhelming evidence of guilt."  <u>Lawson</u>, 60 F.3d at 613.  Other factors to be considered include "whether the [extrinsic evidence] was ambiguously phrased; whether the extraneous information was otherwise admissible or merely cumulative of other evidence adduced at trial; whether a curative instruction was given or some other step taken to ameliorate the prejudice; [and] the trial context."  <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1491 (9th Cir.1997) (en banc).

Even in a habeas context, "reversible error commonly occurs where there is a "direct and rational connection between the extrinsic material and a prejudicial jury conclusion, and where the misconduct relates directly to a material aspect of the case."  <u>Lawson</u>, 60 F.3d at 612-13 (quoting <u>Marino v. Vasquez</u>, 812 F.2d 499, 506 (9th Cir.1987)).  "The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence."  <u>O'Neal v. McAninch</u>, 513 U.S. 432, 438, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995) (quoting <u>Kotteakos</u>).

3. <u>Analysis</u>.

The "evidence" supporting Petitioner's new trial motion was contained in the declaration of one of the jurors.  The 5th DCA began its analysis by reviewing that declaration to determine what portions, if any, were admissible.  (Ex. A, p. 14).  The appellate court excluded paragraphs eight through fourteen because they discussed the juror deliberation process, in contravention of California law.  <u>See</u> Cal. Evid. Code § 1150.  (Ex. A, pp. 16-17).  The court then discussed paragraphs one through seven, which contained descriptions of the declarant, when the deliberations began, and alleged misconduct wherein jurors discussed the case or their own personal experiences during deliberations.  The 5th DCA concludes that all of these allegations were so "vague and remote" that they could not constitute grounds for misconduct.  (<u>Id</u>., p. 15).  Looking at paragraphs six and seven, wherein the declarant explains how various jurors commented on the witnesses, the appellate court again found that such vague references did not constitute grounds for misconduct.

Indeed, the only ground that even facially raised a potential issue of juror misconduct was the declarant's allegation that Juror No. 7 failed to disclose during voir dire that he had been accused of molesting his own daughter, but the charges had later been dropped.  If a juror fails to answer a voir dire question correctly, a petitioner may obtain a new trial by showing: (1) the juror failed to answer

17

honestly a voir dire question, and (2) that this undermined the impartiality of the petitioner's jury. See Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir.1998) (en banc). The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of the trial. See McDonough, 464 U.S. at 556. Forgetfulness, for example, does not indicate lack of impartiality. See United States v. Edmond, 43 F.3d 472, 473-74 (9th Cir.1994) (no misconduct where district court found juror's testimony that he forgot about being victim of armed robbery truthful).

Here, the record does not indicate whether Juror No. 7 was asked about the prior abuse accusation during voir dire or whether his failure to volunteer that fact during voir dire was the result of forgetfulness or deceit.  However, as the 5th DCA pointed out, it could not presume any prejudice by Juror No. 7 against Petitioner based the juror's belated revelation.  To the contrary, the court reasoned that since Petitioner's defense was based on the alleged falsity of the victim's accusations, Juror No. 7, who also claimed to have been falsely accused, would only harbor prejudice against the victim, not vice versa.  If it affected the juror in any way, the Court believed, it would be to sympathize with Petitioner.  Accordingly, the state court concluded that even if Juror No. 7 had wrongfully failed to disclose this prior abuse accusation, it did not prejudice Petitioner's case.

As mentioned previously, to merit habeas relief, Petitioner must not only establish a federal constitutional violation, but must also show that the purported juror misconduct "had a substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637-639.  For the reasons contained in the 5th DCA's decision, such prejudicial effect or influence was absent in this case. Accordingly, the state court's decision was not objectively unreasonable.

B. Sufficiency Of The Evidence.

Petitioner next contends that insufficient evidence was presented to convict him of forcible oral copulation.  This contention is also without merit.

1. The 5th DCA's Opinion.

The 5th DCA rejected Petitioner's claim as follows:

Lopez also asserts that the trial court erred in denying his motion for new trial because the verdict was not supported by substantial evidence. "A trial court has broad discretion in ruling on a motion for a new trial, and there is a strong presumption that it properly exercised that discretion. '"The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of

discretion clearly appears."' [Citation .]" (People v. Davis (1995) 10 Cal.4th 463, 524.) No abuse appears in this case.

Lopez, as he did in the trial court, attacks J.S.'s credibility. He argues that the inconsistencies in J.S.'s testimony and her reputation in the community as a liar render her credibility unbelievable. In other words, Lopez asks us to conclude the jury could not have found J.S. truthful.

While it is true that there were inconsistencies in J.S.'s testimony, our reading of the record does not suggest that the inconsistencies were so compelling as to require the jury to reject her testimony. Instead, the inconsistencies were typical of a witness who had been molested repeatedly over a period of time. Such victims generally do not keep an accurate journal of when every act occurred, or the details of the act. Nor do they enjoy testifying about the events. Moreover, our reading of the record indicates that J.J., the only witness who testified about J.S.'s ability to lie, indicates J.J. was referring to the lies J.S. told so she could spend time with him.

This case, as is the situation with most cases of this type, was decided based on the jury's determination of the credibility of the witnesses. Counsel brought out at trial the very facts Lopez now claims entitle him to a new trial. The jury and the trial court heard the witnesses testify and heard counsel's arguments and determined that J.S. was credible, and Lopez was not. It was their obligation to make that determination, and we do not reweigh the evidence to decide if we would have reached a different conclusion.

In other words, J.S.'s testimony that Lopez molested her repeatedly over an extended period of time was sufficient evidence to support the verdict. The trial court did not err in denying the motion for new trial on this basis.

(Ex. A, pp. 18-19).

    2.   Federal Standard.

The law on sufficiency of the evidence is clearly established by the United States Supreme Court.  Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S. 307, the test on habeas review to determine whether a factual finding is fairly supported by the record is as follows: "[W]hether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990).  Thus, only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief.  Jackson, 443 U.S. at 324.   Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n. 16.

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  Jackson, 443 U.S. at 326.  A

19

jury's credibility determinations are therefore entitled to near-total deference.  Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004).  Except in the most exceptional of circumstances, Jackson does not permit a federal court to revisit credibility determinations.  See id. at 957-958.

In applying the AEDPA's deferential standard of review, this Court must also presume the correctness of the state court's factual findings.  28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459, 106 S.Ct. 2616 (1986).  This presumption of correctness applies to state appellate determinations of fact as well as those of the state trial courts.  Tinsley v. Borg, 895 F.2d 520, 525 (9th Cir.1990).  Although the presumption of correctness does not apply to state court determinations of legal questions or mixed questions of law and fact, the facts as found by the state court underlying those determinations are entitled to the presumption.  Sumner v. Mata, 455 U.S. 539, 597, 102 S.Ct. 1198 (1981).

In Cavazos, v. Smith, __U.S. __, 132 S.Ct. 2 (2011), the United States Supreme Court further explained the highly deferential standard of review in habeas proceedings, by noting that Jackson

> "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable." Renico v. Lett, 559 U.S. ——, ——, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010) (internal quotation marks omitted).
>
> Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

Cavazos, 132 S.Ct. at 3.

> "Jackson says that evidence is sufficient to support a conviction so long as 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' 443 U.S., at 319, 99 S.Ct. 2781.  It also unambiguously instructs that a reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id., at 326, 99 S.Ct. 2781.

Cavazos, 132 S.Ct. at 6. [2]

---

[2] To the extent that the 5th DCA's opinion does not expressly cite the Jackson v. Virginia standard in analyzing the sufficiency claims herein, it must be noted that, long ago, the California Supreme Court expressly adopted the federal Jackson standard for sufficiency claims in state criminal proceedings.  People v. Johnson, 26 Cal.3d 557, 576 (1980).

1      3. <u>Analysis.</u>

2          Initially, Respondent argues that, because this issue was framed by Petitioner in the state court

3  as a wrongful denial of his motion for new trial, the issue is unexhausted.  The Court agrees.

4          As mentioned above, a petitioner must fairly present a federal constitutional issue to the

5  California Supreme Court in order to avoid dismissal for lack of exhaustion.  Here, as with the previous

6  claim, Petitioner couched it as a wrongful denial of his motion for new trial.  And, as with the previous

7  claim, the state court took Petitioner at his word and analyzed the claim under the state standard for

8  granting or denying a motion for new trial, not under the federal standard for sufficiency of the

9  evidence.  Accordingly, the Court concludes that the issue of sufficiency of the evidence, as a federal

10  constitutional violation, was not fairly presented to the state's highest court and is, therefore,

11  unexhausted and should be dismissed.  However, as with the previous claim, the Court will also reject

12  the claim on its merits.

13          Here, the victim testified that Petitioner sexually assaulted her over a prolonged period of time.

14  Petitioner denied those accusations.  Various experts offered their opinions regarding the behavior of

15  individuals who are sexually abused and who make claims of sexual abuse.  In the end, it was the jury's

16  responsibility to weigh the conflicting evidence and make findings of fact regarding who was telling

17  the truth and who was lying.  As the 5th DCA noted, although the victim's testimony contained

18  inconsistencies, as do virtually all witnesses' testimony, those inconsistencies were not so numerous

19  nor so glaring that the jury was required to disregard the victim's testimony as a matter of law.  Under

20  these circumstances, it was entirely within the province of the jury to accept part or all of the victim's

21  testimony as true and to reject any and all of Petitioner's disclaimers and protestations of innocence,

22  including Petitioner's contention that his physical condition during the alleged assaults did not permit

23  him to engage in sexual activity without the use of Viagra, which was not always effective. The record

24  indicates that the jury faithfully discharged its responsibilities as the finder of facts.  Petitioner's

25  objection is, finally, not to the manner in which the jury deliberated or to the amount of evidence

26  presented on both sides, but to the result the jury reached.  After careful review, this Court cannot

27

28  Accordingly, the state court applied the correct legal standard, and this Court's only task is to determine whether the state court adjudication was contrary to or an unreasonable application of that standard.

1    conclude that "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt.

2    Jackson, 443 U.S. at 324.  Accordingly, the claim must fail.

3           C.   Admission Of Propensity Evidence.

4           Next, Petitioner claims that the trial court erred in admitting propensity evidence against

5    Petitioner.  This contention too is without merit.

6                1.   Procedural Default.

7           Respondent contends that Petitioner's claim must be rejected because it is procedurally

8    defaulted.  Respondent points out that, in denying Petitioner's state habeas claim, the state court cited

9    Dixon.  After reviewing the facts and applicable law, the Court agrees the claim is procedurally barred.

10          State courts may decline to review a claim based on a procedural default.  Wainwright v. Sykes,

11   433 U.S. 72, 86–87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).  Federal courts "will not review a question

12   of federal law decided by a state court if the decision of that court rests on a state law ground that is

13   independent of the federal question and adequate to support the judgment."  Coleman v. Thompson,

14   501 U.S. 722, 729 (1991); LaCrosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001); see Ylst v.

15   Nunnemaker, 501 U.S. 797, 801 (1991); Park v. California, 202 F.3d 1146, 1150 (2000) ("A district

16   court properly refuses to reach the merits of a habeas petition if the petitioner has defaulted on the

17   particular state's procedural requirements . . . .");  see also Fox Film Corp. v. Muller, 296 U.S. 207, 210

18   (1935).  This concept has been commonly referred to as the procedural default doctrine.  This doctrine

19   of procedural default is based on concerns of comity and federalism.  Coleman, 501 U.S. at 730-32.  If

20   the court finds an independent and adequate state procedural ground, "federal habeas review is barred

21   unless the prisoner can demonstrate cause for the procedural default and actual prejudice, or

22   demonstrate that the failure to consider the claims will result in a fundamental miscarriage of justice."

23   Noltie v. Peterson, 9 F.3d 802, 804-805 (9th Cir. 1993); Coleman, 501 U.S. at 750; Park v. California,

24   202 F.3d 1146, 1150 (9th Cir. 2000).

25          The mere occurrence, however, of a procedural default will not necessarily bar a federal court

26   from reviewing claims in a petition for writ of habeas corpus.  In order for the procedural default

27   doctrine to apply and thereby bar federal review, the state court determination of default must be

28   grounded in state law that is both *adequate* to support the judgment and *independent* of federal law.

1  Ylst, 501 U.S. at 801;  Coleman, 501 U.S. at 729-30; see also Fox Film Corp., 296 U.S. at 210.  Put

2  another way, the procedural default doctrine will apply only if the application of the state procedural

3  rule provides "an adequate and independent state law basis" on which the state court can deny relief.

4  Park, 202 F.3d at 1151, quoting, Coleman, 501 U.S. at 729-30.

5      "For a state procedural rule to be 'independent,' the state law basis for the decision must

6  not be interwoven with federal law." LaCrosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001) (citing

7  Michigan v. Long, 463 U.S. 1032, 1040-41, 103 S.Ct. 3469 (1983)); Morales v. Calderon, 85 F.3d

8  1387, 1393 (9th Cir. 1996) ("Federal habeas review is not barred if the state decision 'fairly appears to

9  rest primarily on federal law, or to be interwoven with federal law.'" (quoting Coleman, 501 U.S. at

10  735, 111 S.Ct. 2456)).  "A state law is so interwoven if 'the state has made application of the

11  procedural bar depend on an antecedent ruling on federal law [such as] the determination of whether

12  federal constitutional error has been committed.'"  Park, 202 F.3d at 1152 (quoting Ake v. Oklahoma,

13  470 U.S. 68, 75, 105 S.Ct. 1087 (1985)).

14      To be deemed adequate, the state law ground for decision must be well-established and

15  consistently applied.  Poland v. Stewart, 169 F.3d 573, 577 (9th Cir. 1999) ("A state procedural rule

16  constitutes an adequate bar to federal court review if it was 'firmly established and regularly followed'

17  at the time it was applied by the state court.")(quoting Ford v. Georgia, 498 U.S. 411, 424, 111 S.Ct.

18  850 (1991)).  Although a state court's exercise of judicial discretion will not necessarily render a rule

19  inadequate, the discretion must entail "'the exercise of judgment according to standards that, at least

20  over time, can become known and understood within reasonable operating limits.'"  Id. at 377 (quoting

21  Morales, 85 F.3d at 1392).

22      In re Dixon refers to California's procedural rule which provides that a California court, in a

23  habeas corpus proceeding, will not review the merits of a claim if that claim could have been raised in a

24  timely appeal but was not.  In re Dixon, 41 Cal.2d at 759 ("[I]n the absence of special circumstances

25  constituting an excuse for failure to employ [the] remedy [of direct review], the writ will not lie where

26  the claimed errors could have been, but were not, raised upon a timely appeal from a judgment of

27  conviction"). See In re Harris, 5 Cal.4th 813, 823 (1993) (explaining In re Dixon rule).  Despite the

28  petitioner's failure to bring a claim on direct appeal from a conviction, a California court will hear the

merits of case if the court finds one of four exceptions. The four exceptions to the <u>Dixon</u> bar are: (1) fundamental constitutional error; (2) a lack of fundamental jurisdiction by the trial court over the petitioner;  (3) the trial court's acting in excess of jurisdiction; and  (4) an intervening change in the law.  <u>Fields</u>, 125 F.3d at 763, *quoting*, <u>In re Harris</u>, 5 Cal.4th at 828-842.

Since the California Supreme Court's 1998 decision in <u>In re Robbins</u>, 18 Cal.4th 770, 811-812 & n. 32 (1998), the <u>Dixon</u> rule has been independent of federal law.  <u>Park v. California</u>, 202 F.3d 1146, 1152 (2000).  Since the California Supreme Court's 1993 decisions in <u>In re Harris</u>, 5 Cal.4th 813, 823 (1993) and <u>In re Clark</u>, 5 Cal.4th 750 (1993), the <u>Dixon</u> rule has been consistently applied, i.e., "adequate."  <u>Park</u>, 202 F.3d at 1152.  Hence, any state court ruling procedurally barring a habeas claim because the petition failed to raise that claim in his direct appeal, i.e., the <u>Dixon</u> rule, will be barred on federal habeas review unless the petitioner can demonstrate (1) cause for the default and actual prejudice resulting from the alleged violation of federal law, or (2) a fundamental miscarriage of justice.  <u>Harris v. Reed</u>, 489 U.S. 255, 262-263 (1989); <u>Coleman v. Thompson</u>, 501 U.S. 722, 750, 111 S.Ct. 2546 (1989).  In his Traverse, Petitioner does not contend that either of these circumstances exists.  Accordingly, federal habeas review of this claim is barred.

However, even were the foregoing not true, the claim is nevertheless without merit.

2. <u>Due Process</u>.[3]

---

[3]  For both this issue and the following issue, Respondent correctly notes the state court, by procedurally barring the claims, did not expressly address those claims on the merits.  Accordingly, the preliminary question is what standard this Court should apply in analyzing the merits of these two claims.  Respondent suggests that de novo review is appropriate.  The Court finds that independent review is required.  Where a state court's decision is either "contrary to" or an unreasonable application of "clearly established" federal law, the district court must conduct a de novo review of the habeas petitioner's claims.  <u>Delgadillo v. Woodford</u>, 527 F.3d 919, 925 (9th Cir. 2008); see also <u>Frantz v. Hazey</u>, 533 F.3d 724, 735 (9th Cir. 2008)(en banc)("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").  On the other hand, when a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits.  <u>Johnson v. Williams</u>, ––– U.S. ––––, ––––, 133 S.Ct. 1088, 1091, 185 L.Ed.2d 105 (2013).  However, when the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d).  <u>Stanley v. Cullen</u>, 633 F.3d 852, 860 (9th Cir. 2011); <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir.2003); <u>Greene v. Lambert</u>, 288 F.3d 1081, 1089 (9th Cir.2002) (holding that where there is an adjudication on the merits but no reason for the decision, the court must review the complete record to determine whether resolution of the case constitutes an unreasonable application of clearly established federal law); <u>Delgado v. Lewis</u>, 223 F.3d 976, 982 (9th Cir. 2000) ("Federal habeas review is not de novo when the state court does not supply reasoning for its decision, but an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law.").  "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions."  <u>Pirtle v. Morgan</u>, 313 F.3d 1160, 1167 (9th Cir. 2002).  "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."  <u>Himes</u>, 336 F.3d at 853.  Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief."

The United States Supreme Court has expressly left open the question of whether the admission of propensity evidence violates due process.  See  Estelle v. McGuire, 502 U.S. at 75, n. 5; see Holgerson v. Knowles, 309 F.3d 1200, 1202 (9th Cir.2002) (habeas relief not warranted unless due process violation clearly established by the Supreme Court); Garceau v. Woodford, 275 F.3d 769, 774 (9th Cir. 2001), *reversed on other grounds*, Woodford v. Garceau, 538 U.S. 202 (2003)(the Supreme Court "has never expressly held that it violates due process to admit other crimes evidence for the purpose of showing conduct in conformity therewith....").  In this regard, in Holley v. Yarborough, 568 F.3d 1091 (9th Cir. 2009), the Ninth Circuit explained as follows:

> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ [of habeas corpus] should be issued when constitutional errors have rendered the trial fundamentally unfair [Citations], it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.

Holley, 568 F.3d at 1101.  Hence, the state courts' rejection of Petitioner's claim *could not* have been "contrary to, or an unreasonable application of, clearly established" United States Supreme Court authority, since no such "clearly established" Supreme Court authority exists.  28 U.S.C. § 2254(d)(1).

However, even if the foregoing were not true, to the extent that Petitioner contends that the state court violated California Evidence Code §§ 402, 403, 1101, and 1108, Petitioner's claim sounds in state law and is therefore not cognizable in federal habeas proceedings. As discussed previously, federal habeas corpus court has no authority to review a state's application of its own laws, but rather must determine whether a prisoner's constitutional or other federal rights have been violated.  Estelle v. McGuire, 502 U.S. at 67-68; Jackson v. Ylst, 921 F.2d 882, 885 (9th Cir. 1990).  Generally, the admissibility of evidence is a matter of state law, and is not reviewable in a federal habeas corpus proceeding.  Estelle, 502 U.S. at 67; Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir.), *cert. denied,* 478 U.S. 1021 (1985).

Nevertheless, there can be habeas relief for the admission of prejudicial evidence if the admission was fundamentally unfair and resulted in a denial of due process.  Estelle, 502 U.S. at 72; Pulley v. Harris, 465 U.S. 37, 41 (1984); Walters v. Maas, 45 F.3d 1355, 1357 (9th Cir. 1995); Jeffries

---

Harrington, 131 S.Ct. at 784. Regardless, however, of which standard of review is adopted, for the reasons expressed in this section, the Court believes that, under either standard, the claim lacks merit.

1    v. Blodgett, 5 F.3d 1180, 1192 (9th Cir. 1993), *cert. denied*, 510 U.S. 1191 (1994); Gordon v. Duran,

2    895 F.2d 610, 613 (9th Cir.1990).  However, the failure to comply with state rules of evidence alone is

3    neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds.

4    Jammal v. Van de Kamp, 926 F.2d 918, 919-920 (9th Cir. 1991).  Only if there are no permissible

5    inferences that the jury may draw from the evidence can its admission rise to the level of a due process

6    violation.  Id. at 920.  Intent is a permissible inference that the jury may draw from the evidence of

7    prior bad acts.  See Houston v. Roe, 177 F.3d 901, 910 n. 6 (9th Cir. 1999).

8            Here, Petitioner has failed to show that no permissible inferences existed that the jury might

9    draw from the challenged evidence; accordingly, it does not rise to the level of a federal claim and is,

10   therefore, merely an issue of state law.[4]   At the very least, the challenged evidence was probative of

11   Petitioner's intent to commit sexual assault on the victim.  The Court need not speculate further about

12   permissible bases for admission of this propensity evidence as intent alone is sufficient.  Houston v.

13   Roe, 177 F.3d at 910 n. 6.

14           Moreover, as Respondent observes, California Evidence Code § 352 requires the trial judge to

15   balance the probative value of proffered evidence with its potential prejudicial effect.  Such a balancing

16   requirement safeguards due process vis-à-vis the admission of uncharged offenses under Cal. Evid.

17   Code § 1008.  E.g., Mejia v. Garcia, 534 F.3d 1036, 1047, n. 5 (9th Cir. 2008); United States v. LeMay,

18   260 F.3d 1018, 1026-1027 (9th Cir. 2001).  The record shows that the trial judge conducted just such a

19   balancing analysis pursuant to § 352 before admitting the challenged evidence, concluding that the

20   evidence was probative because it involved the same victim and perpetrator, because it involved the

21   "same course and standard of events," because it showed "a contact between the two people that is

22   ongoing," because is also showed "a propensity to commit the offense," and because it would not

23   involve much court time to present.  (1 RT 5-6).  Under all of these circumstances, the Court cannot say

24

25   ───────────────────────

     [4] Merely placing a "due process" label on an alleged violation does not entitle Petitioner to federal relief.  Langford v. Day,
26   110 F.3d 1386, 1388-89 (1996).  Broad, conclusory allegations of unconstitutionality are insufficient to state a cognizable
     claim. Jones v. Gomez, 66 F.3d 199, 205 (9th Cir.1995); Greyson v. Kellam, 937 F.2d 1409, 1412 (9th Cir.1991) (bald
27   assertions of ineffective assistance of counsel did not entitle the petitioner to an evidentiary hearing); see also Hiivala v.
     Wood, 195 F.3d 1098, 1106 (9th Cir.1999), *citing* Gray v. Netherland, 518 U.S. 152, 162-63 (1996) ("general appeals to
28   broad constitutional principles, such as due process, equal protection, and the right to a fair trial, are insufficient to establish
     exhaustion).

that the state court's refusal to afford Petitioner relief on this claim was objectively unreasonable.

D. <u>Prosecutorial Misconduct</u>.

Finally, Petitioner claims that the prosecution committed misconduct and violated Petitioner's federal constitutional rights by failing to produce exculpatory evidence in the possession of the prosecution.  This contention too is without merit.

1. <u>Procedural Default</u>.

As with the preceding claim, Respondent contends that it is procedurally defaulted since the California Supreme Court denied the claim with a citation to <u>Dixon</u>.  For the same reasons as those expressed in Claim Three, the Court agrees. However, even on the merits, the claim fails.

2. <u>Federal Standard</u>.

Due process requires that the prosecution disclose exculpatory evidence within its possession. <u>Brady v. Maryland</u>, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); <u>Cooper v. Brown</u>, 510 F.3d 870, 924 (9th Cir.2007). There are three components of a <u>Brady</u> violation: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; the evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." <u>Strickler v. Greene</u>, 527 U.S. 263, 281–82 (1999). <u>See also Banks v. Dretke</u>, 540 U.S. 668, 691 (2004); <u>Silva v. Brown</u>, 416 F.3d 980, 985 (9th Cir.2005). A failure to preserve evidence violates a defendant's right to due process if the unavailable evidence possessed "exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." <u>California v. Trombetta</u>, 467 U.S. 479, 489 (1984). A defendant must also demonstrate that the police acted in bad faith in failing to preserve the potentially useful evidence. <u>Arizona v. Youngblood</u>, 488 U.S. 51, 58 (1988); <u>Phillips v. Woodford</u>, 267 F.3d 966, 986–87 (9th Cir.2001).

The presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed. <u>Youngblood</u>, 488 U.S. at 56–57 n. *, 109 S.Ct. 333; <u>see also Grisby v. Blodgett</u>, 130 F.3d 365, 371 (9th Cir.1997); <u>United States v. Barton</u>, 995 F.2d 931, 934 (9th Cir.1993); <u>United States v. Cooper</u>, 983 F.2d 928, 931 (9th Cir.1993). "The mere failure to preserve evidence which could have been subjected to tests which might have

1   exonerated the defendant does not constitute a due process violation." Phillips, 267 F.3d at 987

2   (quoting United States v. Hernandez, 109 F.3d 1450, 1455 (9th Cir.1997)). See also Youngblood, 488

3   U.S. at 57, 109 S.Ct. 333.

4           3.   Analysis.

5           Initially, as with the previous argument, the Court will apply the independent review standard to

6   reject this claim on its merits, while also noting that, under the de novo review standard, the claim also

7   fails.

8           Petitioner's claim stems from an in limine hearing at the second trial at which the issue of

9   admissibility of prior propensity evidence was argued.  The prosecution sought to introduce evidence of

10  four claims of sexual assault by Petitioner against the victim that had been dismissed in the first trial

11  due to jurisdictional problems, i.e., because they occurred during one of the victim's softball trips and

12  the victim was unable tell prosecutors in which county those acts occurred, the prosecution could not

13  prove that venue was proper in Los Angeles County.  (1 RT 1-2).  Originally, the prosecution had

14  assumed all of the acts occurred in Los Angeles County, but after further investigation, it appeared that

15  some of the offenses had occurred in other counties where no criminal proceedings against Petitioner

16  had been initiated.  (1 RT 1-2).

17          At the in limine hearing, defense counsel sought all police reports related to these four

18  incidents, but the prosecution insisted that the defense already had all reports in the possession of the

19  prosecution and that no further reports were in the prosecution's possession.  (1 RT 4-7).  Defense

20  counsel contended that she had just become aware of at least two interviews that had been conducted

21  with the victim regarding these four offenses.  (1 RT 6-7).  However, defense counsel was unable to

22  assert with any certainty that any transcript or reports had actually been generated as a result of the

23  alleged interviews.  (Id.).  Ultimately, the trial court denied the defense motion for production of

24  transcripts or reports regarding these interviews, citing the fact that the prosecution had assured the

25  court that all documents had been given to the defense, and the fact that there was no evidence that any

26  undisclosed documents actually existed in the possession of the prosecution.  (Id. at 6).  This was not an

27  unreasonable decision.

28          First, there was no evidence introduced at the hearing that these interviews or reports really

existed.  It was only the defense's speculation that they <u>might</u> exist that drove the motion for production.  Second, even if the interviews and reports did exist, there is nothing in this record to suggest that the reports or documents contained exculpatory evidence.  Indeed, as Respondent correctly points out, if the interviews were with the victim, it is far more likely that they contained inculpatory, rather than exculpatory, evidence.  Finally, even assuming, as sheer speculation, that such interviews did exist and that they did contain exculpatory information, the claim is so devoid of facts and details that it is impossible to conclude that their non-disclosure "had a substantial and injurious effect or influence in determining the jury's verdict."  <u>Brecht</u>, 507 U.S. at 637-639.   Therefore, the claim should be rejected.

**<u>RECOMMENDATION</u>**

Accordingly, the Court RECOMMENDS that Petitioner's First Amended Petition for Writ of Habeas Corpus (Doc. 37), be DENIED with prejudice.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within 21 days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be served and filed within ten days (plus three days if served by mail) after service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

Dated:   **October 9, 2014**                                 **/s/ Jennifer L. Thurston**
                                                              UNITED STATES MAGISTRATE JUDGE

29